UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

JEFFERY POWELL,                    )
                                   )
        Plaintiff,                 )
                                   )        No. 6:17-CV-122-REW-HAI
v.                                 )
                                   )        OPINION AND ORDER
DAVID FUGATE, et al.,              )
                                   )
        Defendants.                )

*** *** *** ***

Defendants—former jail staff and the jail itself—move for summary judgment on a former

inmate's constitutional and state law claims. DE #63. After full initial briefing, a reopened

discovery window, and supplemental briefing, the motion stands ripe for decision. For the reasons

that follow, the Court grants in part and denies in part. There are several material factual disputes.

Some of Powell's claims patently fail as a matter of law, but others must go forward so that a jury

may sift through the evidence and determine precisely what Powell experienced at the Kentucky

River Regional Jail.

## I.      Facts and Procedural Background

In the early hours of October 13, 2016, Hazard City Police arrested Plaintiff Jeffery Powell

on suspicion of driving under the influence (DUI) and transported him to the Kentucky Regional

River Jail (KRRJ). Several discordant voices offer accounts of the events that followed—two

officers involved in the incidents, the KRRJ's administrator, a fellow inmate, and Powell

himself. There is also a short clip of blurry jail footage. The record is disjointed and inconclusive.

Powell's memory is only in "bits and pieces"; but, he maintains, "what I do remember, I

remember for sure." DE #60 (Powell Depo.) at 15.[1] Although at times incomplete, Powell's account is not inconsistent with the video.

At approximately 7:30 a.m. on October 13, police transported Powell (age 19) to the jail after a single-vehicle car accident, and KRRJ staff began the booking and intake process. DE #62 (Smith Depo.) at 9; *see* DE #63-2 at 4 (DUI Uniform Citation). Tony Smith was the deputy supervisor on duty when Powell arrived. Smith watched as Deputy Carlow Young took inventory of Powell's property. DE #62 at 11. As Young counted Powell's cash, Powell declared that some of his money was missing. DE #60 at 16. Powell testified that he asked about the money in a non-accusatory fashion, but Smith and Young told him to "sit down [and] shut up." *Id.* at 15–16. Fellow inmate and trustee Robert Fannin, who was out of his cell on laundry duty and observed this conversation from an adjoining hallway, testified that Powell was nonviolent toward the guards, unresisting, and "pissed off but [not] out of control pissed off. He was just asking." DE #69 (Fannin Depo.) at 7. Fannin added that Young and Smith were taunting Powell and immediately threatening violence toward him. *Id.* at 9 ("Carlow made the comment to him that if he wouldn't spend his money on whores, he'd probably have it."; "Carlow told him that if he didn't shut his [expletive] mouth that he'd knock his brains out."; "Tony told him if he didn't shut his mouth, he wouldn't have to worry about Carlow whooping him, that he would."). Powell also accuses Young and Smith of mocking him for having an African-American girlfriend and of using racial slurs. DE #60 at 47.

Powell testified that Smith began to hit him and Young proceeded to gratuitously mace and tase him[2] when he would not be quiet, after which Powell "kind of blacked out a little bit and

---

[1] The deposition citations in this Opinion refer to the CM/ECF pagination.
[2] Whether Smith hit Powell first or Young maced Powell first is somewhat unclear; Powell believed he was maced and then hit, but Fannin observed the opposite. *Compare* DE #60 (Powell

[doesn't] really recall[]" what happened next. *Id.* at 16; *id.* at 17 ("After I was maced, I didn't know what was going on. I couldn't see, I couldn't breathe, I was freaking out."); *id.* at 51 ("Carlo[w] was the one that was macing and tazing me, because Tony was the one mostly hitting me in my face. It was like they [were] just both on me."); *id.* at 52 (Powell testifying that he "didn't do anything to be punched" and "didn't do anything to be maced"). Although Powell does not remember the precise circumstances or sequence surrounding this incident,[3] it appears that, in the struggle, Young and a fellow deputy—Jordan Noble, who is not a party to this case—got mace in their eyes as well. DE #62 (Smith Depo.) at 16 ("I didn't really hear nothing until two of my deputies [came] out of there with pepper spray in their eyes."); DE #61 (Young Depo.) at 32–33 ("[H]e swings around, 'bout the time I spray it. He hits my hand and he comes literally two inches from my face and I spray myself."). Fellow inmate Fannin corroborates parts of Powell's version of these events, with a couple of slight variations. He recalls seeing Smith punch Powell (seated at booking) "so hard that [Powell] came off the chair and his head bounced off the floor." DE #69 (Fannin Depo.) at 23. Fannin further testified that Powell "was hit a couple more times after that, too," before the deputies "drug" Powell away and administered mace out of Fannin's sight. *Id.* Powell stridently denies being "combative" or behaving violently toward jail staff and insists that he was handcuffed during this encounter.[4] *See* DE #60 (Powell Depo.) at 17, 52–53.

---

Depo.) at 48 *with* DE #69 (Fannin Depo.) at 23. Regardless, Powell testified that he felt like this was all happening almost simultaneously. *See* DE #60 at 51.

[3] Powell indicates that Defendants perhaps maced him more than once. *See* DE #60 (Powell Depo.) at 17 ("I know I was in handcuffs the first time I got maced."). However, Powell does not describe a second use of mace, and there is no other evidence that one occurred.

[4] The lack of video proof of the booking encounter is at least surprising, given the ubiquity of cameras and the course of the day.

The next thing Powell remembers is waking up "a little bit later" in a restraint chair and using baby wipes to clean the mace out of his eyes.[5] *Id.* at 16. Young testified that, in the intervening time, KRRJ staff had placed Powell in a detox cell, but Young became concerned because he "couldn't keep Inmate Powell awake." DE #61 (Young Depo.) at 35. Young stated that Powell told jail staff that he had taken multiple doses of Xanax, *id.* at 36–37, and a triage report completed by KRRJ nurse Katherine Ritchie just after the intake incident provides that Powell reported taking three or four sleeping pills.[6] DE #70-6; *see also* DE #70-7 (October 13, 2016, 9:00 a.m. Narrative Progress Note). As to the presence of physical injuries, the triage report notes only a small bruise and "small red nodule" near Powell's right eye. DE #70-6. To observe Powell and to keep him awake, Young (with Smith's permission) removed Powell from the detox cell and placed him in a restraint chair near the booking area, leaving him unrestrained. DE #61 at 35–36. Per the KRRJ "Detox Observation Log" that Young and Noble completed, staff watched Powell in the chair and intermittently awakened him from about 10:30 a.m. until 1:30 p.m. DE #63-3 at 6.[7]

Young, Smith, and David Fugate—the KRRJ administrator—testified that Powell then began making suicidal remarks. DE #61 (Young Depo.) at 43; DE #62 (Smith Depo.) at 23–24;

---

[5] There is no evidence of Powell being given a change of clothes after being coated in mace, and, in the later KRRJ footage, he remains in street clothes (presumably his own and the same as when he was maced).

[6] Powell only remembers having taken 1.5 unidentified pills on October 13, which his brother had offered and said would help him sleep; Powell acknowledges that this could have been Xanax. DE #60 (Powell Depo.) at 19–21.

[7] Whether Powell was restrained or not restrained in the chair, during the October 13 morning and early afternoon, is not entirely clear. *Compare* DE #63-3 at 2 (Young Aff. stating that Powell was unrestrained until he made suicidal threats at 1:30 p.m.) *with* DE #63-3 at 6 (Detox Observation Log suggesting that Powell had to be released from the restraint chair multiple times to stand and use the restroom before 1:30 p.m.). The answer, however, does not affect the analysis in this Opinion.

DE #68 (Fugate Depo.) at 19. This may have been but one stray remark. *See, e.g.*, DE #61 at 43 ("Inmate Powell said he was gonna kill himself."). Powell does not deny that he made such statements but testified that he does not remember making any. DE #60 (Powell Depo.) at 17. Per "protocol," the jailers decided to restrain Powell pending a suicide assessment. *See* DE #63-2 (Fugate Aff.) at 2. The brief exchange that followed is memorialized in grainy footage from a nearby KRRJ camera.[8] *See* DE #70-13.[9] The video opens with a front-facing view of Powell sitting still, unrestrained, in a chair located in a hallway facing the booking area.[10] First Smith and then Young enter the scene. *Id.* at 0:00:23–0:00:27. Smith attempts to strap Powell's left arm to the chair, while Young attempts to restrain Powell's right arm. *Id.* at 0:00:37–0:00:50. Powell appears initially cooperative in this process, but he soon begins to struggle and attempt to free himself from the restraints. *Id.* at 0:00:52–0:00:55. He eventually wrestles his right arm out of the strap (described as faulty) on the chair. *Id.* at 0:00:56. As Young and Smith again try to secure Powell's left arm, the guards obstruct the view of Powell. *Id.* at 0:01:00:0:01:02. At this point, Smith and Young are in front of Powell, so it is impossible to see precisely what happens next. *Id.* at 0:01:02–0:01:03. The jailers claimed that Powell punched Smith. DE #62 (Smith Depo.) at 27; DE #61

---

[8] The video begins at 1:49 p.m. on October 13, 2016, per the time and date stamps. No audio accompanies the footage.

[9] Plaintiff's exhibits are marked inconsistently. The physical thumb-drive containing the full video of the restraint chair incident (described and referenced here) is marked as "Exhibit 13." Presumably, this corresponds with DE #70-13, left as a placeholder for the video conventional filing maintained in the Clerk's Office. However, Powell also submits a shorter version of the same incident that is physically marked as "Exhibit 12;" the attachment DE #70-12, however, is not a video placeholder (it is, rather, the "Second Narrative Progress Note"). And, there is a video placeholder at DE #70-15 that fails to correspond with any physical exhibit. The Court has done its best to be clear.

[10] *See* DE #62 (Smith Depo.) at 21 (discussing camera positioning).

(Young Depo.) at 45. Fugate confirmed that he saw Powell punch Smith.[11] DE #68 (Fugate Depo.) at 27.

Next, Smith punches the surrounded and still-seated Powell twice in the face and places him in a 4-5 second chokehold.[12] DE #70-13 at 0:01:03–0:01:09. Young and a third deputy then appear to pull Smith away. *Id.* at 0:01:09–0:01:10. Smith retreats from Powell, and Fugate enters and emphatically points towards Smith and then Powell before exiting the camera's view. *Id.* at 0:01:10–0:01:23. Finally, Young and the third deputy secure Powell's restraints before leaving Powell, restrained in the chair, alone in the hallway. *Id.* at 0:01:25–0:02:59. The remaining four minutes of footage show Powell sitting alone, restrained and subdued. The footage is largely consistent with Powell's testimony: "I recall, you know, [Smith] hitting me in my face, you know, repeatedly while I was restrained." DE #60 (Powell Depo.) at 39; *id.* at 51 ("Tony was the one mostly hitting me in my face."). Fannin observed the fallout from the incident, testifying: "Later on [Powell] was sitting strapped down in the chair 'beat to death.' Now whether these guys did it or whether he beat himself to death, you know, I can't tell you. But I can tell you he was beat to death strapped to a chair later on." DE #69 (Fannin Depo.) at 47. Fannin continued: "He had a bruise around his eye . . . [H]e had a busted lip. He had what looked to be a few scrapes on his

---

[11] Fugate testified that, at the time of the incident, he saw Powell strike Smith, yet he did not see Smith strike Powell. However, Fugate admitted that he was in the same room during the altercation—the video indicates that he was positioned near the camera, with a similar vantage point—and, per the footage, the events unfolded in very quick succession. *See* DE #68 (Fugate Depo.) at 26–27. In his deposition, Fugate agreed that the video showed Smith strike Powell.

[12] Several witnesses noted Powell's diminutive size and contrasted it with the dimensions of Young and Smith. *See, e.g.*, DE #61 (Young Depo.) at 63–64 (testifying that he weighed a hundred pounds more than Powell); DE #62 (Smith Depo.) at 25–26 (noting that Powell weighed "[o]nly 130, 40 pounds[]" and that nearly all KRRJ jailers involved in these incidents likely outweighed him); DE #69 (Fannin Depo.) at 23 (emphasizing that Powell "wasn't 150 pound[s]"). Relative size and strength surely impact the reasonableness of force in the context of instances such as these.

face, a cut and he complained about his ribs. That's what I saw and heard." *Id.* Powell did not see

Young or Smith again after these events, as October 13 was their last day at the KRRJ.[13]

The KRRJ charged Powell with third-degree felony assault on a corrections officer based

on Powell's alleged punch. *See* DE #63-2 at 19 (Assault 3rd Uniform Citation). The citation notes

(seemingly written by Smith) state: "[T]his inmate informed myself that he was going to kill

himself. Myself and Deputy Young were placing inmate Powell's hands in restraint straps in

restraint chair. Inmate Powell jerked his right hand out of strap and punched this deputy in the

face." *Id.* At a Perry District Court preliminary hearing on the charge, the presiding judge found

probable cause to send the matter to the grand jury based on the testimony of Smith and Fugate

and the video footage of the incident.[14] *See* DE #70-14 (video of preliminary hearing).[15] The case,

however, never reached the grand jury. *See* DE #62 (Smith Depo.) at 27 ("And you've not

presented the assault third to the grand jury yet[?] . . . No, I haven't . . . Is there a reason? . . . I

really didn't want to send a 19-year-old boy to prison."). Powell denies ever hitting Smith or

assaulting anyone at the KRRJ. DE #60 (Powell Depo.) at 52, 55. With a new felony charge, the

KRRJ held Powell on a heightened bond, and Powell ultimately remained in KRRJ custody for

approximately two weeks. *Id.* at 54–55.

---

[13] Although Plaintiff speculates otherwise (without support), these incidents did not precipitate Smith's or Young's resignation, as the two were scheduled for voluntary layoffs. *See* DE #68 (Fugate Depo.) at 12–13; DE #69 (Fannin Depo.) at 17. Powell admits he does not know the circumstances surrounding the deputies' departure. *See* DE #60 (Powell Depo.) at 55, 63–64.

[14] At the preliminary hearing, Smith did not mention hitting Powell. *See* DE #70-14 at 0:02:45– 0:02:50 (Smith simply testifying that he "kind of walked off from [the situation] after [Powell] punched [him]"). Nor did Smith mention the dispute over Powell's allegedly missing money as leading to an initial altercation during booking.

[15] For clarity, the Court notes that the physical thumb-drive containing this portion of the preliminary hearing (Smith's testimony) is marked as "Exhibit 14," presumably corresponding with the noted placeholder at DE #70-14.

Powell does not recall much of what happened after the filmed incident, only that he "woke up a couple of days later in the restraint chair[.]" DE #60 (Powell Depo.) at 16–17; *id.* at 18 ("[A]fter I was getting beaten in the restraint chair, I was getting hit so many times that I couldn't recall nothing honestly."). Powell conceded, however, that it may have simply "felt like two [] days." *Id.* at 50. The Kentucky Jail Mental Health Crisis network performed a risk assessment on Powell on the evening of October 13, noting that he was "sitting in the restraint chair and ha[d] calmed down," but was still under the influence of Xanax and marijuana. DE #70-8 at 1. Records from Kentucky River Community Care (KRCC) indicate that the facility treated Powell between 8:00 p.m. and 9:30 p.m. on October 13, 2016. DE #63-5 at 2. The KRCC provider reported that Powell had "been withdrawing from Xanax" and "ha[d] been expressing suicidal ideations." *Id.* As a result, the provider recommended that Powell "stay in the restraint chair with a release every two hours." *Id.* at 3. Medical records show Powell faring better the following day. A second Episode Report from the Kentucky Jail Mental Health Crisis Network on October 14 found Powell "sober and in control," and no longer expressing suicidal ideations, although it noted that Powell might not yet be aware of the new felony assault charge against him. DE #70-9 at 2. When the KRCC saw Powell later on October 14, the provider noted that Powell appeared significantly better but included a recommendation that the KRRJ continue to "observe him for any side-effects or withdrawal symptoms from drug use." *Id.* at 5–6.

Other records show that Powell visited the emergency room at Hazard ARH Regional Medical Center (ARH) on October 15.[16] DE #63-6 at 21. There, Powell tested positive for a

---

[16] Powell contrarily testified that jail staff "didn't take [him] to a hospital until about a week and a half after [he] was beaten," but confirmed ARH as the treating facility. DE #60 (Powell Depo.) at 30–31. Powell's later testimony indicates that his perception of the general timeline is undoubtedly foggy. *See id.* at 50. Furthermore, Powell effectively concedes in his response to the summary judgment motion that jail staff took him to the hospital on October 15, 2016. *See* DE #70 at 8.

benzodiazepine (a drug category encompassing Xanax). DE #63-3 at 15. ARH records further indicate that Powell had fainted at the jail at some point, at least in part prompting this visit. DE #63-6 at 7 (stating "syncope and collapse" as reason for visit). A second KRRJ Narrative Progress Note from later in the afternoon on October 15, written by KRRJ nurse Kelly Cockrell, also states that Powell fainted: "[Inmate] blacked out [in a cell], hit his head on the door and bit his tongue." DE #70-12. Cockrell adds that Powell believed he had a concussion from the October 13 car accident and reported experiencing withdrawal symptoms; Cockrell's notes ostensibly reflect Powell's self-reported description of his condition at that time. Contrary to Powell's and Fannin's descriptions of Powell's injuries, ARH records report only some slight swelling of Powell's head.[17] *See* DE #63-6 at 25. For his part, Powell has little memory of his medical treatment. He merely recalls seeing a jail nurse "once or twice at least[,]" unsuccessfully attempting to discuss the alleged beatings with an individual from the KRCC, and later visiting the emergency room at ARH. DE #60 (Powell Depo.) at 25–26, 28–29.

Powell describes only one other incident during his stay at the KRRJ. Sometime after the altercation with Smith (although, Powell admits his memory of the timeline is hazy), a large guard (who ironically went by "Tiny") brought inmates into Powell's cell and urine tested them near where Powell was trying to sleep. *Id.* at 47 ("[L]ater on . . . in jail, a guard they call Tiny, he's like—he's big . . . [was] bringing inmates into my cell and drug testing them right beside me, having them pee right there where I laid my head beside my bed."). When Powell protested, Tiny

---

[17] As previously discussed, Powell and Fannin asserted, among other things, that "both of [Powell's] eyes were swollen shut[,]" DE #60 (Powell Depo.) at 29, and "he had a busted lip[,]" DE #69 (Fannin Depo.) at 47. Powell attacks the medical records' accuracy and credibility, arguing that the existence of discrepancies demonstrates that the records are fabricated and the KRRJ was engaging the medical professionals in a scheme to cover-up the alleged assaults on Plaintiff. DE #95 at 3. Even in the summary judgment context, this suggestion is a stretch.

"pulled [him] out of [his] cell and was like, 'You don't want no problems with me, Boy. I will give you a real reason to go to the hospital[.]'" *Id.* at 48. Powell notes that he was "on psychiatric watch" at the time of this incident. *Id.* at 47.

Based on his view of these events, Powell initiated suit against Smith, Young, Fugate, and the KRRJ in the Perry Circuit Court. Powell alleged that Fugate and the KRRJ violated his constitutional rights under 42 U.S.C. § 1983, lodged state law claims of negligent hiring, supervision, and retention against Fugate and the Authority as a result of their employment of Smith and Young, asserted an abuse of process claim against Fugate and the Authority based on the felony assault charge, and brought claims of intentional infliction of emotional distress (IIED) against all Defendants. Defendants removed the case to this Court due to Powell's constitutional claims. DE #1. After Defendants moved for summary judgment (DE #63), Powell responded (DE #70), and, on that same day, also moved to amend the Complaint to assert several additional claims. Defendants subsequently replied in support of their summary judgment motion. DE #82. After full briefing on the amendment issue, the Court permitted inclusion of Smith and Young in the § 1983 excessive force claims and Smith in the abuse of process claim; the Complaint already factually implicated them on those counts, and justice favored this limited amendment under the circumstances. DE #92. The Court permitted an additional window for discovery on the amendments and supplemental briefing on Defendants' pending summary judgment motion. *See id.* Defendants supplemented DE #63 (DE #94), Powell responded (DE #95), and Defendants replied (DE #96).

## II.    Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Courts may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson*, 106 S. Ct. at 2512).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the

nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

### III.   § 1983 Claims

#### A.  Qualified Immunity

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*,

134 S. Ct. 3, 5 (2013) (per curiam) (citations and quotation marks omitted)). Importantly, qualified immunity is "an immunity from suit rather than a mere defense to liability[,]" and reviewing courts should resolve the issue as early in a case as practicable. *Mitchell v. Forysth*, 105 S. Ct. 2806, 2815 (1985). The qualified immunity inquiry is twofold, requiring assessment of "(1) whether the facts alleged by the plaintiff make out the violation of a constitutional right and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." *Gavitt v. Born*, 835 F.3d at 640. The Court may address either prong first, and, ultimately, "if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Id.* (quoting *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant is not entitled to qualified immunity. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). A defendant asserting immunity must initially demonstrate "facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id*. The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct."[18] *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017). Where "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate

---

[18] "This not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 107 S. Ct. 3034, 3039 (1987). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3037.

clearly established rights[,]" a court must deny summary judgment. *Gardenhire*, 205 F.3d at 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

**B.  Excessive Force Claims Against Smith and Young**

Powell's excessive force claims against Smith and Young address two alleged incidents: (1) when Smith hit Powell, and Young tased and maced him, during booking; and (2) when Smith later punched Powell while Powell sat in the restraint chair. The Fourth Amendment provides the proper analytical lens for this context because the incidents occurred after Powell's initial booking at the KRRJ, but prior to any probable-cause hearing. *See Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988); *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010)) ("The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances . . . Fourth Amendment protections, including those against excessive force, continue during booking and at all times prior to a probable-cause hearing." (internal quotation marks and citations omitted)). The Fourth Amendment inquiry evaluates the "objective reasonableness" of the force used under the circumstances. *See Hanson*, 736 F. App'x at 528.

This analysis is heavily fact-dependent, and courts should approach it "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). "The officer's subjective intentions are irrelevant" to this calculus. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). The Court must "weigh the government's interest justifying the use of force against the individual's interest in avoiding that force," in light of "the measure of deference due an officer's on-the-spot decisions[.]" *Id.* at 301. The Court must further heed the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and the

"policies and practices . . . needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell v. Wolfish*, 99 S. Ct. 1861, 1878 (1979)) (alteration in original). The Supreme Court has articulated a non-exhaustive list of factors to consider in evaluating the reasonableness of force used on a pretrial detainee: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *See Hanson*, 736 F. App'x at 528–29 (quoting *Kingsley*, 135 S. Ct. at 2473).

Per Powell's and Fannin's testimony, Smith hit Powell multiple times during intake, while Powell was nonviolent and nonthreatening. DE #60 (Powell Depo.) at 51–52; DE #69 (Fannin Depo.) at 23–24. Smith admits contacting Powell and causing him to fall from the stool onto the floor, but he argues that this force was necessary because Powell had "acted like he was going to get up" from the stool on which Smith had ordered him to sit. DE #62 (Smith Depo.) at 14. Powell claims that Young then proceeded to mace and tase him; he describes the overall sequence of events as occurring nearly simultaneously. DE #60 at 51 ("Carlo[w] was the one that was macing and tazing me, because Tony was the one mostly hitting me in my face. It was like they [were] just both on me."). Powell maintains that he was not combative, insists that he was handcuffed throughout the incident, and testified that he "didn't do anything to be maced[,]" and "didn't do anything to be punched[.]" DE #60 at 52; *see id.* at 16–17 ("I know I was in handcuffs the first time I got maced. I know I was, because I couldn't do nothing to block the mace. I just turned my

body . . . And when I was in the handcuffs still, they proceeded to taze[19] me."). There is no footage of this incident to contradict Powell's account, and Fannin's testimony partly corroborates Powell's claim that Smith used excessive force, although Fannin did not witness administration of the pepper spray or taser. DE #69 at 23–24. Although Defendants cast Powell as combative, warranting the force used here, the Court may not evaluate the two competing stories to determine which version is more likely true.[20] And, Young himself conceded that Powell voiced no physical threats. *See* DE #61 (Young Depo.) at 26.

Needless to say, gratuitously punching, macing, and/or tasing a restrained inmate, as described by Powell, would violate the inmate's clearly established constitutional rights. *See Coley v. Lucas Cty.*, 799 F.3d 530, 540 (6th Cir. 2015) (concluding that "pretrial detainees had a clearly established right not to be gratuitously assaulted while fully restrained and subdued"). *See also Bultema v. Benzie County*, 146 F. App'x 28, 35 (6th Cir. 2005) (reiterating "that use of a chemical spray on a suspect who is already handcuffed and no longer poses a threat to the safety of the officers or others constitutes excessive force"); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (holding that pepper-spraying a fully restrained and non-threatening arrestee constitutes excessive force); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (holding that pepper-spraying a compliant arrestee constitutes excessive force). At the time of this incident, "the law clearly established that the 'amount of force that was used' must be roughly proportionate to the 'need for the application of force.'" *Estate of Kulpa v. Cantea*, 708 F. App'x 846, 853 (6th

---

[19] The word tase is a colloquialized derivative of the proper noun Taser, and this misspelled alternative appears in context in the deposition transcript. *See* Merriam-Webster, "Tase," https://www.merriam-webster.com/dictionary/tase.

[20] *See EEOC v. Ford Motor Co.*, 752 F.3d 634, 642 n. 3 (6th Cir. 2014) ("It is not our role at the summary judgment stage to assess whether testimony is believable; such credibility contests are for the trier of fact to resolve.").

Cir. 2017) (quoting *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014) (internal quotation marks and citation omitted)). Accepting as true Powell's and Fannin's testimony that Powell was not violent or resistant, both Smith's and Young's uses of force could be deemed unnecessary and objectively unreasonable. Ultimately, the conflicting accounts of this incident raise "a question of fact whether [Powell] posed an immediate threat to the safety of the officers or others." *Howard v. Wayne Cty. Sheriff's Office*, 417 F. App'x 465, 471 (6th Cir. 2011) (quoting *Vaughn v. City of Lebanon*, 18 F. App'x 252, 266–70 (6th Cir. 2001). The Court must allow a jury to decide precisely how much force Smith and Young used and whether the circumstances justified it.

Similarly, there is a fair question as to whether Smith used excessive force during the restraint chair incident. The jail footage shows Smith punching Powell twice in the face before putting him in a chokehold for 4-5 seconds, at which point Young and the third deputy on film step in to quell the situation. *See* DE #70-13 at 0:01:03–0:01:10. During this altercation, Powell was in the restraint chair with one arm restrained. *Id.* Smith admitted punching Powell twice and speculated that Young likely stepped in because Young "didn't want [Smith] to do nothing that [he'd] get in trouble for because it was [their] last day[.]" DE #62 at 31. Although Young, Smith, and Fugate testified that Powell punched Smith first (*see* DE #62 (Smith Depo.) at 27; DE #61 (Young Depo.) at 45; DE #68 (Fugate Depo.) at 27), this is not evident from the video. Perhaps Powell used his unrestrained arm to strike Smith, but Young was literally standing over Powell and had his hands on Powell at that moment. *See* DE #70-13 at 0:01:00–0:01:03. Due to the vantage point, the video does not show the interaction with any clarity. Powell denies having punched Smith. DE #60 (Powell Depo.) at 52, 55.[21] Accepting Powell's statement as true, and

---

[21] Indeed, even if Powell did punch Smith, it is debatable whether two responsive punches and a subsequent chokehold constituted the necessary amount of force to regain control over the seated Powell.

based on the controvertible video evidence, a jury could rationally conclude that it was objectively unreasonable for Smith to punch Powell twice in the face. Moreover, a jury could conclude that it was further unnecessary for Smith to place Powell in a chokehold after administering the blows to his face. As previously discussed, it was clearly established that the force used must be proportional to the need for its application, and that Powell had the right not to be punched or choked gratuitously once he no longer posed any threat. *See Coley*, 799 F.3d at 541 ("Chokeholds are objectively unreasonable where an individual is already restrained or there is no danger to others."); *see also Estate of Kulpa*, 708 F. App'x at 853.

Given the disputed need for and degree of Smith's and Young's application of force in both incidents, it is appropriate to let a jury review the proof and determine whose characterization of the events to credit. The parties recount markedly different versions, and material factual discrepancies preclude summary judgment, even on a qualified immunity basis. *See Poe*, 853 F.2d at 426 ("Summary judgment would not be appropriate if there is a factual dispute (i.e. a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights."). The Court cannot determine whether Smith or Young used objectively reasonable force without engaging in improper factfinding, and, thus, it must deny them qualified immunity on the excessive force claims.

## C. Excessive Force Claim Against Fugate

Despite Plaintiff's statements to the contrary, "[i]t is well-settled that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009)); *accord Bellamy v. Bradley*, 729 F.2d

416, 421 (6th Cir. 1984). To be liable, a supervisor must have "encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 421 (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir. 1982)); *see also Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)) (requiring evidence "that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct"). A "mere failure to act" will not suffice. *Peatross*, 818 F.3d at 241. "There must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury." *Id.* (quoting *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). The supervisor must have "d[one] more than play a passive role in the alleged violations or show mere tacit approval of the goings on[.]" *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). And, critically, there must be a causal connection between the supervisor's improper execution of his job function and the plaintiff's injuries. *Peatross*, 818 F.3d at 242.

Powell alleges that Fugate lied about witnessing Smith's use of unconstitutional force on him and turned a blind eye to what was occurring in his presence. The video of the restraint chair altercation establishes that Fugate was on the scene at the time, and Fugate admits his presence. *See* DE #68 (Fugate Depo.) at 19–20. Indeed, Powell's citation for the resulting assault charge lists Fugate as a witness. *See* DE #70-4. However, Fugate testified—both at the preliminary hearing on the assault charge and in this case—that, at the time, he did not observe Smith hit Powell but saw

Powell hit Smith. *Id.*; *see also* DE #70-5 (physically marked "Exhibit 4")[22] at 0:02:40–0:02:55 (Fugate confirming on direct examination at the preliminary hearing that he did not observe Smith strike Powell). Because the events unfolded so quickly, and Fugate was nearby and admittedly witnessed a portion of them, Powell contends that Fugate could not have observed Powell punch Smith but miss Smith's responsive blows. Fugate does not offer a concrete explanation for how he missed the latter, merely stating that he "just couldn't see." *Id.* at 20.[23] Powell suggests that Fugate was lying to protect Smith from consequences for his use of excessive force. The video evidence reasonably supports an inference that Fugate necessarily witnessed Smith use force on Powell in the restraint chair and, thus, may have lied about Smith's force in an attempt to cover it up.

Courts have found supervisory liability where, among other things, supervisors covered up subordinates' unconstitutional conduct to protect them. *See Coley*, 799 F.3d 542 (denying qualified immunity to a supervisor who had "full knowledge" of the assault at issue and "intentionally and deliberately made false statements to federal officials about [his] knowledge of [it]"); *accord Peatross*, 818 F.3d at 243 (denying qualified immunity where a supervisor "attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability"). A jury could find that Fugate fabricated his knowledge in a way that would protect the jail. Thus, Fugate, not yet in view on the video but a direct participant, claims he saw the first event, the Powell punch. Despite the same (or a closer) vantage point, he claims not to have seen the second event, the Smith punches. This could be innocent, or it could be malevolent. Jurors

---

[22] Again inconsistently marked, Plaintiff submitted a physical thumb-drive containing Fugate's preliminary hearing testimony that is labeled with a sticker reading "Exhibit 4." However, DE #70-4 is the "Assault Citation." DE #70-5, rather, is the video placeholder.
[23] When asked to confirm that he did not see Smith strike Powell in "actual time[,]" Fugate also responded: "Where I was standing, by the time I got over there…" DE #68 at 19–20. Given that Powell is alleged to have hit Smith first, this response sharply conflicts with Fugate's theory.

could rationally perceive Fugate, the jail administrator responsible for actually ordering Powell's restraint, as fomenting, facilitating, or endorsing Smith's violent act by assisting in hiding or fabricating the true events of the day. And, indeed, such supervisory conduct—ordering an inmate's restraint, observing a guard's repeated striking of the restrained inmate absent intervention, and then lying about the incident to hide the guard's use of force and shield the jail from consequences—could reasonably give rise to precisely the sort of unchecked inmate abuse that Powell alleges he suffered. *See Peatross*, 818 F.3d at 244–245 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012) (finding a causal connection between a police supervisor's execution of his job function and an arrestee's harm where the supervisor's "rubber stamping" of officer misconduct "could be reasonably expected to give rise to just the sort of injuries that occurred").

The facts, viewed in the light most favorable to Powell, could reasonably demonstrate Fugate's implicit authorization and approval of Smith's use of excessive force. Credibility determinations and evidence-weighing are required to determine what exactly Fugate saw—or did not see— which, in turn, supplies the necessary context for evaluating his later actions. Fugate, who directed Powell's restraint in the chair and was indisputably present at the scene of Smith's alleged constitutional violations, is not entitled to qualified immunity on the excessive force claim. *Cf. Hanson*, 736 F. App'x at 539 (quoting *Peatross*, 818 F.3d at 242) (implicitly endorsing the value of evidence that a supervisor was present at the scene of the incident and noting that it is the "very rare case" where "a supervisor does not have to be 'physically . . . present at the time of the constitutional violation"). The Court rejects the propriety of summary judgment on the issue of Fugate's direct liability.

### D. Deprivation of Medical Care Claim Against Fugate

Powell argues that Fugate violated his constitutional rights by depriving him of necessary medical care. Powell asserts that Fugate failed to order Powell's examination at a hospital until two days after his arrival, despite it being the usual practice of the KRRJ to have detainees who had been in car accidents examined at a hospital prior to admission at the jail. *See* DE #70-1 at 8; DE #62 (Smith Depo.) at 13 (". . . I believe [the arresting officer] was trying to get out of there as soon as possible, because we usually require a hospital to check them out if they've been in a motor vehicle accident before accepting them. But a lot of officers try to give [jail staff] a citation and run out the door so they don't have to."). Powell also suggests that Fugate later observed the injuries his deputies caused but purposely declined to get Powell medical attention until it was necessary "to prevent his condition from potentially worsening to death" because Fugate wanted to "cover[] up the vicious beating that Mr. Powell was the victim of." DE #70-1 at 8.

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008)). Such a claim has both an objective and a subjective component. *Id.* (citing *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)). "For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Spears*, 589 F.3d at 254. "For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Id.*

First, the Court questions whether Powell's injuries—swollen black eyes and a "busted" lip (*see* DE #60 at 29 and DE #69 at 47), per Powell's story—constituted sufficiently serious medical needs. *See, e.g.*, *Gonzalez v. Lusardi*, 930 F. Supp. 3d 840, 854–55 (E.D. Ky. 2013) (finding a black eye insufficiently serious for a deliberate indifference claim). Also, Powell has not shown that Fugate recklessly disregarded *any* medical need of Powell, much less a serious one. "[T]he failure to follow internal policies, without more, [does not] constitute deliberate indifference." *Winkler*, 893 F.3d at 892; *see also Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) (noting that corrections officers' failure to comply with departmental policy requiring medical attention for detainees with specified blood-alcohol content levels was not a *per se* constitutional violation). A supervisor will not be liable in these circumstances absent evidence that he "abandoned the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department[]" and "execution of the supervisor['s] job function" caused the plaintiff's injury. *Winkler*, 893 F.3d at 898 (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). Powell received screening not long after his arrival at the KRRJ—from the KRCC and Kentucky Jail Mental Health Crisis on October 13, the date of Powell's arrival, as well as at ARH on October 15—and there is no argument, much less evidence, that this care was inadequate.[24] There is no evidence that Fugate abandoned his duties as a supervisor in ensuring Powell received care. Nor is there evidence that Fugate did so in the face of any "actual knowledge of a breakdown" at the KRRJ in that regard. *See Winkler*, 893 F.3d at 898. Given the utter absence of proof related to this claim, the Court rejects it. Although the guard

---

[24] Plaintiff simply states that, because the KRRJ allegedly failed to follow its policy of seeking medical care for an inmate involved in a car accident prior to admission, "any medical care that was alleged to have been provided prior to be taken [sic] to the hospital was inherently inadequate." DE #70-1 at 9. Having rejected the idea that a failure to follow policy equates with deliberate indifference, the Court similarly dismisses this contention.

conduct in this case is concerning, Powell has not established, on the medical side, harm or medical results grave enough, or indifference culpable enough, to support the care-denial claim. Powell had access to medical care, and the record does not show significant medical issues to be addressed. Rank speculation will not avoid summary judgment.

### E. *Monell*[25] **Claim Against the KRRJ**

"To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's constitutional rights." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) (citing *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007)); *Monell*, 98 S. Ct. at 2038. The plaintiff must first "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"; where the plaintiff cites an unofficial policy on behalf of the municipality, he must show that, while the policy was never "formally approved by an appropriate decisionmaker," it was nevertheless "so widespread as to have the force of law." *Bd. of County Comm'rs of Bryan County v. Brown*, 117 S. Ct. 1382, 1388 (1997). Plaintiff argues that there is an official policy of concealing the inner KRRJ workings and an unofficial policy of overlooking guards' use of excessive force.

As evidence that there is an official secrecy policy at the KRRJ, Plaintiff merely supplies an employment document from 2004 that Smith signed when he began work at the facility (then-called the Perry County Detention Center, before it became the Kentucky River Regional Jail). The document lists various job expectations and states: "What goes on at the jail stays at the jail." DE #70-16. However, this ambiguous phrase in an aged onboarding document is insufficient

---

[25] *Monell v. Dep't of Social Servs. of City of N.Y.*, 98 S. Ct. 2018 (1978).

evidence from which a rational juror could conclude that there is a current official policy of secrecy (even assuming a constitutional dimension to such a policy).

To support his claim that there is an unofficial policy of overlooking force used at the KRRJ, Powell cites Fugate's enabling and concealing conduct with respect to Smith's use of force in this case. However, while the evidence supports a reasonable inference of misconduct on Fugate's part in this instance (as discussed previously), it does not demonstrate any "widespread" practice of evidence concealment or secrecy regarding excessive force allegations. Plaintiff does not cite to evidence that any alleged "look-the-other-way" policy extended beyond Fugate. Nor does Powell provide arguments regarding or evidence of force training inadequacies.[26]

That Plaintiff points to several former KRRJ guards that have been prosecuted for altercations with inmates does not change this conclusion. Smith admits that "there[] [are] about five [former KRRJ guards] facing federal time right now[]" based on their use of force against inmates. DE #62 at 32. Plaintiff offers no details (time, personnel, date, supervision, specifics) as to these events, and he casts them all as allegations rather than concluded matters. Even if this rings like pattern proof, Powell has not tied it to any institutional policy, whether official or unofficial, that could be the "moving force" behind such incidents, including those at issue here. Critically, Powell does not develop any theory that would render the KRRJ responsible for its offending guards' behavior, such as a systemic failure to train or a broader pattern of lack of responsive discipline on the part of the KRRJ. Rather, Plaintiff relies solely on the existence of undetailed previous incidents. This generic effort does not suffice to create a triable *Monell* issue.

---

[26] Notably, Plaintiff does not develop any failure-to-train theory in the context of his *Monell* claim.

IV.  **State Law Claims**[27]

A.  **Qualified Official Immunity**

Kentucky "[p]ublwic officers are responsible only for their own misfeasance and negligence and are not responsible for the negligence of those employed by them if they have employed persons of suitable skill." *Yanero v. Davis*, 65 S.W.3d 510, 528 (Ky. 2001) (citations omitted). "[W]hen an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, 'which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.'" *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (quoting *Yanero*, 65 S.W.3d at 522). Determining whether an action occurred "in a legally uncertain environment" ultimately requires "classifying the particular acts or functions in question in one of two ways: discretionary or ministerial." *Turner v. Nelson*, 342 S.W.3d 866, 874 (Ky. 2011) (quoting *Haney*, 311 S.W.3d at 240). Qualified immunity protects individuals performing discretionary acts, but not ministerial acts. *See id.*

B.  **Negligence Claims Against Fugate and Intentional Infliction of Emotional Distress Claim Against All Defendants**[28]

Overall, Powell presents absolutely no evidence, developed arguments, or reasoned analysis for these claims. A successful Kentucky negligence claim requires "proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his

---

[27] "A federal court exercising supplemental jurisdiction is bound to apply the law of the forum state, including its choice of law rules." *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) (citing *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989)). Substantive Kentucky law applies to the state tort claims in this case.

[28] Although the Complaint includes the KRRJ in the state tort claims, "Plaintiff concedes that under Kentucky law state entities . . . are immune from state tort claims" and pursues claims against the KRRJ instead only under § 1983 via *Monell*. DE #70-1 at 13.

or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). "[P]ublic officers and employees are entitled to 'qualified official immunity' for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (i.e. were not made in 'bad faith'), and (3) were within the scope of the employee's authority." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006), *as corrected*, (Sept. 26, 2006). Powell's treatment of the negligence elements is wholly deficient. Nor does Plaintiff even attempt to overcome qualified official immunity in this context. Rather, in his less-than-half-page argument, Powell confusingly invokes *res ipsa loquitur* as the basis for his negligence claims, arguing that there is no possible explanation for Powell's mistreatment besides Fugate's negligence. There is no support for application of this theory (and Smith was an 18-year veteran), and Plaintiff does not flesh it out in any substantive way.

Similarly, Powell devotes one line to his IIED argument, merely stating that "the facts previously cited" as the basis for other arguments "indicate that the Defendants' actions were calculated to intimidate the Plaintiff and cause severe emotional distress." DE #70-1 at 16. With utterly no proof on the intensity of any emotional harm, the IIED claim is not triable. *See Sheliga v. Todd*, No. 2011–CA–002132–MR, 2013 WL 869608, at *5 (Ky. Ct. App. Mar. 8, 2013) (stating that "the party opposing [a] motion for summary judgment[] was required to present some affirmative evidence of severe emotional distress to support his claim); *see also White v. Bourbon Cmty. Hosp., LLC*, No. 5:14-CV-79-REW, 2016 WL 208303, at *9 (E.D. Ky. Jan. 15, 2016) (citing *MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015)) (considering a lack of "expert proof on the degree of any emotional harm[]" to be "another likely fatal flaw to any IIED theory").

"[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995) (citation omitted)). That is precisely the circumstance here. Plaintiff's half-hearted attempts at addressing these claims, lacking both argumentation and evidentiary support, patently fail.

### C. Abuse of Process Claim Against Fugate and Smith

An abuse of process is "the irregular or wrongful employment of a judicial proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (quoting *Stoll Oil Refining Company v. Pierce,* Ky., 337 S.W.2d 263 (1960)). The essential elements of the claim are: (1) an ulterior purpose and (2) a willful act in the use of the judicial process not proper in the regular conduct of the proceeding. *See id.* Powell argues that he did not hit Smith while in the restraint chair and that Smith concocted the story for the purpose of bringing legal action against Powell, thus deterring Powell from taking action against the KRRJ. Perhaps this creates a question on motive, but Powell nowhere shows misuse of process relative to the criminal case itself. In other words, Plaintiff critiques the charge, but he does not claim that the criminal process played out in an improper, irregular, or untoward way. Without proof tying the use of process to a collateral effect—and Powell offers nothing but speculation here—the claim falters. *See Cherry v. Howie*, 191 F. Supp. 3d 707, 716 (W.D. Ky. 2016) (quoting *Simpson v. Laytart*, 962 S.W.2d 392, 395 (Ky. 1998) ("Both elements must be present, as 'there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions.'"). Thus, Powell

fails in a necessary proof component, and the Court grants judgment for the defense on this state law theory.

## V.    Conclusion

For all the reasons discussed, and on the terms outlined in this Opinion, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (DE #63).

This the 8th day of March, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**